UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : |
| v. | : Criminal No. 07-118-01 (RBW) |
| | : |
| | : (Under Seal) |
| | : |
| MARVELL D. MAYS, | : |
| Defendant. | : |

GOVERNMENT'S MEMORANDUM IN
AID OF SENTENCING

The United States of America, by its attorney, the United States Attorney for the District of Columbia, respectfully offers this Memorandum in Aid of Sentencing.

*Involvement in the Instant Case*

Marvell D. Mays came to the attention of law enforcement when a telephone he was using appeared in the call history of a major cocaine trafficker (hereinafter "MCT"). Because the agents had a long-term investigation underway, they elected not to pursue Mays due the fact that they had limited time and resources.

In 2006, however, a cooperating defendant in the Eastern District of Virginia (hereinafter "CI") identified Mays as being one of his cocaine customers, stating that he had sold Mays a kilogram of cocaine on two separate occasions. Agents from the Bureau of Alcohol Tobacco and Firearms (hereinafter "ATF") and the Drug Enforcement Administration (hereinafter "DEA") began having the CI record telephone calls between himself and Mays. Over the next several months, Mays and the CI talked several times in code. The CI explained that these conversations were about cocaine purchases.

2

Eventually a "reversal" was planned wherein the CI would tell Mays he had a kilogram of cocaine to sell. The CI was instructed to arrange a meeting place and to give Mays a price for the drugs. The following is the factual proffer regarding the offense to which Mays pleaded guilty:

In late 2005, Mays met a cooperating informant/defendant (hereinafter "CI") through a relative. The CI had connections to a group of Guatemalan nationals who were trafficking in kilogram quantities of cocaine. The CI explained to Mays that he had such connections. The CI sold Mays at least two kilograms of cocaine over a month's time. These sales took place in suburban Maryland at different locations. Further, Mays paid $21,000 for each kilogram of cocaine. After these early contacts, the CI was arrested and began to work for the United States as a cooperating defendant.

Then, in March 2006, the CI and Mays met in Prince George's County, Maryland. During this meeting, Mays provided the CI with $10,000 in exchange for a kilogram of cocaine. The CI returned the $10,000 to Mays and explained to Mays that kilogram quantities of cocaine sold for $21,000 each. Mays then told the CI that he could sell the CI a Smith and Wesson 9mm pistol, however, the CI did not buy the pistol.

During each of the telephone conversations both Mays and the CI spoke in thinly veiled codes so as to avoid being detected by law enforcement.

During 2006, Mays telephoned the CI several times to request quantities of cocaine, however, the CI did not have any cocaine and could not supply Mays with any additional amounts. The ATF was monitoring these phone calls, and was attempting to set up a law enforcement method known as a reversal, but twice Mays was so late for the arranged reversals that agents aborted the operation and no reversal took place. In at least one of these telephone conversations, Mays asked the CI if he knew any other cocaine suppliers who might be willing to supply Mays with cocaine. In September 2006, Mays took the CI to his condominium located at 1501 27th Street, SE, Washington, DC. Mays explained to the CI that the CI could use Mays' condominium to cook cocaine.

Between late 2006 and April 2007, Mays called the CI several times to request kilogram quantities of cocaine. However, on each occasion the CI said that he did not have access to cocaine. In April 2007, however, the CI agreed to sell a kilogram of cocaine to Mays in exchange for $21,000 in U.S. currency. The Immigration and Customs Enforcement (hereinafter "ICE") made up a 1-2% formula of cocaine (hereinafter "sham") and placed it in kilogram wrappings. Mays and the CI agreed to meet in a parking lot in the vicinity of Howard University in Northwest Washington, D.C., on April 19, 2007 so that Mays could purchase a kilogram of cocaine from the CI for $21,000. Special Agents from the Bureau Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF") arrived to monitor the meeting and to arrest Mays if he tried to buy the kilogram. Wearing a monitoring and recording

    device, the CI was searched and given the sham in a black computer case. Mays arrived in a car with dealer tags. He got in the CI's car and began counting the money he had brought after explaining that he needed to do so. The CI handed the case containing the sham to Mays who looked at it and exclaimed, "My man! You came through for me!" Mays accepted the case containing the sham and placed it between his legs on the passenger side floorboard of the CI's car. Soon Mays realized that he had not brought all of his money in the CI's car and he stepped out of the CI's car to go back to his own car to collect the rest of the cash. After returning to the CI's car, members of ATF moved in and placed Mays under arrest. They recovered the sham from the passenger floorboard where Mays had been sitting and approximately $16,000 in U.S. currency from Mays.

    Pursuant to court-authorized search warrants, Mays' condominium at 1501 27th Street, SE, Washington, DC, was searched and agents recovered a digital scale, cutting agents, marijuana, a quantity of cocaine and a quantity of crack cocaine, and a pistol.

Further investigation revealed no link between the MCT whose phone had brought Mr. Mays to the attention of law enforcement. Indeed, we ask this Court to assume that there is no link between Mr. Mays and the MCT for purposes of this sentencing.

*Cooperation*

After his arrest, Mays was represented by Mr. David Bos of the Federal Public Defender's Office. A debriefing was set for a date shortly after the defendant's arrest. At the scheduled debriefing, the defendant did not speak. He later hired Mr. James Rudasill and eventually, months later, agreed to plead guilty and cooperate. The defendant had several meetings with law enforcement. He blamed the CI for entrapping him into the attempted purchase of cocaine, but, not until May 2008, did he ever claim to have been motivated by a drug habit. Further, he assigned blame for the drugs, scale, pistol, and other accouterment in his condominium, to a tenant he called "Messy." Messy was not in the apartment when the agents executed the search warrant. Mr. Mays never provided a lease for Messy's tenancy, and he claimed not to know Messy's true first or last

4

name. Further, he claimed not to know any other address associated with Messy. He said he knew Messy to be "a stick-up boy," and that he had no financial records of Messy because Messy paid cash to lease the condominium.

So began Mays interaction with the government. Unfortunately, Mr. Mays' behavior did not change.

At most meetings Mays displayed anger and irritation with the DEA and ATF agents who were attempting to interview him. Although he claimed to have information about no fewer than five murders, he denied actually witnessing any murder and provided detectives no information that was beyond what they already knew about their cases. Further, he could not pinpoint dates of the murders to within months of their actual occurrence. Nor was he correct in most instances about the years in which the murders had taken place.[1]

Mr. Mays treated the DEA agent, Cindy Buskey, with such anger that it challenged her considerable patience. He twice demanded that both the undersigned counsel and his own attorney leave the debriefing room so he could talk to Prince George's County, Maryland detectives alone. On many occasions Mr. Mays complained that government's counsel had not gotten him transferred to the Correctional Treatment Facility (hereinafter "CTF") from the jail, and that, while in the jail, he could not touch his daughter during visitation. He falsely claimed that the government had promised him such a placement, even though he was advised repeatedly that he had a separation order that would prevent his transfer to CTF. Several times it was explained to Mr. Mays that he was obligated to cooperate and that government was not going to exchange favors or special placement

---

[1] The detectives present at the debriefing were not the detectives assigned to the murders and initially thought that Mr. Mays' information had greater value. Later, they located the assigned detectives and learned that Mr. Mays had supplied no new information.

5

for his cooperation.

Shortly before the final debriefing of Mr. Mays, government's counsel received the objections to the Pre-Sentence Report filed by defendant's counsel, Mr. James Rudasill, which appeared to contradict the factual proffer admitted by the defendant at the time he entered his guilty plea.

At the last debriefing, the fifth arranged by government's counsel despite law enforcement's exasperation with Mr. Mays, Mr. Mays told government's counsel that he "forgave" her, and offered stale information about a homicide to the detective. He again blamed the DEA and the CI for his problems, and, for the first time, claimed to have been using cocaine. He further claimed that the kilograms of cocaine he purchased in the past were for his personal use.

The Departure Committee of the United States Attorney's Office reviewed all of the defendant's information and declined to agree to allow undersigned counsel to file a departure motion.

*Criminal History and Recidivism Risk*

Mr. Mays criminal history is somewhat older, but his willingness to return to the world of illicit drugs was a decision too easily made. Mr. Mays has the following prior convictions: 1) Possession of Cocaine with Intent to Distribute from 1993; 2) Possession of a Controlled Dangerous Substance with Intent to Distribute from 1994; and 3) Reckless Driving from 1997. All three of these convictions occurred in Prince George's County, Maryland.

Based on the defendant's criminal history, including the instant case, the defendant is at significant risk of re-offending since he tends to turn to criminal behavior to solve certain problems.

6

*Value of Cooperation*

The United States has determined to not file a departure motion after considering all of the facts and circumstance. Mr. Mays clearly did not provide substantial assistance.

*Recommendation*

Based on the above factors the government requests that this Court sentence Mr. Mays to the low end of the range recommended by the Federal Sentencing Guidelines.

*Conclusion*

**WHEREFORE**, the United States respectfully requests that the Court to sentence the defendant accordingly.

Respectfully submitted,

JEFFREY A. TAYLOR.
UNITED STATES ATTORNEY

By: _____
S. ELISA POTEAT
Assistant United States Attorney
Bar No. 420-604
555 4th Street, NW
Washington, D.C. 20530
Ph. 202-514-7067

7

*Certificate of Service*

I HEREBY certify that a copy of the foregoing Government's Memorandum in Aid of Sentencing has been served by email, upon counsel for defendant, Mr. James Rudasill, Attorney at Law, this 4th day of June, 2008.

 

_____
S. ELISA POTEAT
Assistant United States Attorney